**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAMEA BROUSSARD and MICHAEL SCHIRANO, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>DOLE PACKAGED FOODS, LLC,<br><br>Defendant. | Case No: 3:23-cv-3320<br><br>CLASS ACTION<br><br>**COMPLAINT FOR CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MISREPRESENTATION, AND UNJUST ENRICHMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Shamea Broussard and Michael Schirano, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, bring this action against Dole Packaged Foods, LLC ("Dole"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.      Dole manufactures certain packaged snacks, including parfaits, gels, and juice products, that it markets and labels with representations designed to convince consumers that they are generally healthy or good for you, and also specifically beneficial to immune system function. For example, on its website, Dole invites consumers to "experience our healthy and delicious ingredients" and, on the label of these products, Dole "promise[s] [that these products will] provide everyone, everywhere with good nutrition!" and "help[] support a healthy immune system."

2.      While representing that these packaged products are healthy and beneficial to the immune system, Dole simultaneously manufactures them so that they contain at least 29% and up to 96% of their calories from added or free sugar.[1]

3.      Contrary to the Dole's manufacturing practices and marketing of the products, a vast body of reliable scientific evidence establishes that excessive consumption of FA Sugar—any amount above approximately 5% of daily caloric intake—is toxic to the human body and greatly increases the risk of cardiovascular disease, diabetes, liver disease, and a wide variety of other chronic diseases. Likewise, consumption of FA Sugar impairs rather than benefits the immune system.

4.      Because loading these products with FA Sugar and marketing them as good for you is directly contrary to the science, Dole's claims are false or at least highly misleading. For example, Dole packs its popular gel snack products, which are marketed towards children as "good nutrition," with up to 20 grams of added sugar. This is 166% more added sugar than the AHA's recommended daily limit for children 4-8 years old.

---

[1] Because the free sugars in juice act physiologically identically to added sugars, *see infra* Part II.A, and the Products (as defined in paragraph 13 herein) include both free and added sugars, the term "FA Sugar" is used throughout this Complaint.

5.     Because the Products are not healthy, but rather are the type of foods and beverages that detriment bodily health, Plaintiffs bring this action against Dole on behalf of themselves, similarly-situated Class Members, and the general public, to enjoin Dole from deceptively marketing the Products, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

6.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Dole. In addition, more than two-thirds of the members of the class reside in states other than the state in which Dole is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

7.     The Court has personal jurisdiction over Dole because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by distributing and selling the Dole Products in California.

8.     Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Dole resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

9.     This civil action arises substantially out of acts and omissions of Defendant's that occurred in Contra Costa County. Accordingly, pursuant to Civil Local Rule 3-2(c) & (d), this action is correctly assigned to the San Francisco or Oakland Division.

## PARTIES

10.     Plaintiff Shamea Broussard is a California citizen because she lives in Pleasant Hill, California and intends to remain there.

11.     Plaintiff Michael Schirano is a New York citizen because he lives in West Islip, New York and intends to remain there.

12.     Defendant Dole Packaged Foods, LLC, is a California limited liability company. Dole Packaged Foods LLC is owned by Dole Food Company, Inc., which has its principal place of business in

Westlake Village, California.

## FACTS

### I.    DOLE MARKETS THE PRODUCTS AS HEALTHY, NUTRITIOUS FOODS

13.    During at least the four years preceding the filing of this Complaint and continuing today, Dole has sold and marketed certain packaged food and beverage products, including: (a) Fruit Bowls in Gel, (b) Fruit Bowl Parfaits, (c) Fruit Bowls in Juice, (d) Fridge Packs, (e) Canned Fruit in Heavy Syrup, (f) Canned Fruit in Light Syrup, (g) Canned Juices, and (h) "Fruitify" Beverages (collectively, the "Products").[2] Dole has sold and sells the Products on a nationwide basis, including in California and New York.

### A.    Dole Employs Strategic Marketing Expressly Designed to Convince Consumers that the Products are Healthy to Maximize Profits

14.    Dole is a sophisticated marketing company that is well aware that consumers are generally willing to buy and to pay more for foods they perceive as being healthy. This is common knowledge in the food industry and well documented in industry research. Nielsen's 2015 Global Health & Wellness Survey for instance, found that "88% of those polled are willing to pay more for healthier foods."

15.    Accordingly, Dole employs a strategic marketing campaign that is expressly designed to convince consumers the Products are healthy.

16.    On Dole's website, www.dolesunshine.com, which it directs consumers to via the Products' labeling, Dole expressly touts the Products as being healthy.

[Space intentionally left blank]

---

[2] During the relevant time period, the Products were sold in at least 51 flavors or varieties, identified herein, but this Complaint should be read to include any additional varieties not yet identified.

*Broussard et al. v. Dole Packaged Foods, LLC*, No. 3:23-cv-3320
CLASS ACTION COMPLAINT

17.     For example, Dole also touts its Fruit Gels, Bowls, and Parfaits as "nutritious and tasty" and encourages consumers to "experience [Dole's] healthy and delicious ingredients."[3]



18.     Dole also claims that for "almost 120 years . . . Dole has believed that good nutrition should be more like sunshine – available for all. This is why our rallying cry of **'Sunshine for All®'** is important not only for us, but for all people across the world. A more equitable world where everyone – irrespective of their **age, race, income, location, or gender** – has the right to nutrition that comes from the goodness of the earth."[4]

> Since our humble beginnings almost **120 years ago**, Dole has believed that good nutrition should be more like sunshine – **available for all.**
>
> This is why our rallying cry of **"Sunshine for All®"** is important not only for us, but for all people across the world. A more equitable world where everyone – irrespective of their **age, race, income, location, or gender** – has the right to nutrition that comes from the goodness of the earth.

---

[3] https://dolesunshine.com/us/en/products/fruit-bowls/.

[4] *Available at* https://dolesunshine.com/us/en/promises/working-towards-zero-processed-sugar/.

19.    "As part of [its] goal to care for more people by contributing to good nutrition for 1 billion people," Dole acknowledges it must "work[] to eliminate processed sugar[5] in all [its] products . . . ."[6]

20.    It even notes the importance of providing products that are "Low in Fructose."[7]



21.    In addition, Dole's marketing of the Products, particularly its Fruit Bowls, is targeted at parents of school-aged children and intended to convince those parents that they are healthy snacks for their young children.

22.    For example, "[a] three-month integrated marketing campaign" in early 2022 titled "Hold My Fruit Bowl" was "aimed at parents with school-aged children . . . ."[8] The campaign was intended to be "[a] playful spin on the 'Hold My Beer' meme," with "the humorous spots showcas[ing] kids doing the impossible with a little help from" Dole's Fruit Cups.[9] The campaign was "built on the foundational insight[] that *six in 10 parents say their kids request fruit cups*" and "reinforces the functional benefits of Fruit Bowls® so parents can feel confident they're feeding their kids healthy, nutritious snacks."[10]

---

[5] FA Sugar impacts the body in the same manner as other common processed sugars, like table sugar, because it has been released from the food matrix and any naturally occurring fiber that it may be encased in.

[6] https://dolesunshine.com/us/en/promises/working-towards-zero-processed-sugar/.

[7] https://dolesunshine.com/us/en/products/.

[8] "Dole Packaged Foods, LLC Unveils New 'Hold My Fruit Bowl' Campaign," PR Newswire (Jan. 5, 2022), *available at* https://www.prnewswire.com/news-releases/dole-packaged-foods-llc-unveils-new-hold-my-fruit-bowl-campaign-301454385.html.

[9] *Id.*

[10] *Id.* (emphasis added).

23.    Dole claims in product descriptions provided to online retailers that "Our cups are a healthy, fun kids snack perfect for school lunches, sports team practice and family get togethers"[11]

24.    Dole's Fruitify Beverages are similarly marketed as "A perfect healthy juice for both kids and adults!"[12]

**B.    The Labeling of the Products is Designed to Convince Consumers that the Products are Healthy Snacks**

25.    In addition to its off-label marketing, each Product's packaging or labeling bears claims designed to convey to consumers that the Products are healthy.

**1.    Fruit Bowls in Gel**

26.    During the relevant time period, Dole has sold Fruit Bowls in Gel, in at least the following varieties: Mandarin Oranges in Orange Flavored Gel, Mango in Mango Flavored Gel, Mixed Fruit in Black Cherry Flavored Gel, Mixed Fruit in Peach Flavored Gel, Diced Peaches in Strawberry Flavored Gel, Diced Peaches in Watermelon Flavored Gel, and Pineapple in Lime Flavored Gel. These are sold in multi-packs of 4.3-oz cups.

27.    Despite that 76-89% of calories per serving come from FA Sugar, the packaging of the Fruit Bowls in Gel makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Dole Fruit Bowls® seal in goodness and nutrition."

• "Vitamin C is an antioxidant that helps support a healthy immune system."

---

[11]    https://www.instacart.com/products/43454-dole-yellow-cling-diced-peaches-in-100-fruit-juice-cups-4-oz.

[12] https://www.jewelosco.com/shop/product-details.970097376.html.

*Label – Front*

*Label – Back*



### 2.    Fruit Bowl Parfaits

28.    During the relevant time period, Dole has sold Fruit Bowl Parfaits, in at least the following varieties: Apples & Crème and Peaches & Crème. These are sold in multi-packs of 4.3-oz cups.

29.    Despite that 36-44% of calories per serving come from FA Sugar, the packaging of the Fruit Bowl Parfaits makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Dole Fruit Bowls® seal in goodness and nutrition."

• "Vitamin C is an antioxidant that helps support a healthy immune system."

*Label – Front*



*Label – Back*



### 3.      Fruit Bowls in Juice[13]

30.      During the relevant time period, Dole has sold Fruit Bowls in Juice, in at least the following

varieties: Diced Apples in 100% Fruit Juice, Mixed Fruit in 100% Fruit Juice, Cherry Mixed Fruit in 100%

Fruit Juice, Yellow Cling Diced Peaches in 100% Fruit Juice, Pineapple Paradise Pineapple Tidbits in a

---

[13] One would expect that the juice in the Fruit Bowls comes from the fruit in the bowls, but it is actually from concentrate and is not even from the same type of fruit. For example, the juice in the Peach Fruit Bowls comes from concentrated white grapes, acerola, and lemons.

Blend of 100% Fruit Juices, Tropical Fruit in 100% Fruit Juice, Red Grapefruit Sunrise in a Blend of 100% Fruit Juices, Diced Pears in 100% Fruit Juice, and Mandarin Oranges in 100% Fruit Juice. These are sold in multi-packs of 4.3-oz cups.

31.     Despite that 29-40% of calories per serving come from FA Sugar, the packaging of the Fruit Bowls in Juice makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Dole Fruit Bowls® seal in goodness and nutrition."

• "Vitamin C is an antioxidant that helps support a healthy immune system."

*Label – Front*



*Broussard et al. v. Dole Packaged Foods, LLC*, No. 3:23-cv-3320

CLASS ACTION COMPLAINT

***Label – Back***



4.     **Fridge Packs**

32.     During the relevant time period, Dole has sold Fridge Packs, in at least the following varieties: Mixed Fruit in 100% Fruit Juice, Yellow Cling Peach Slices in 100% Fruit Juice, Pineapple Chunks in 100% Pineapple Juice, and Mandarin Oranges in Fruit Juice. These are sold in 15-oz containers.

33.     Despite that 29-40% of calories per serving come from FA Sugar, the packaging of the Fridge Packs makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

*Label – Front & Side*



### 5.    Canned Fruit in Heavy Syrup

34.    During the relevant time period, Dole has sold Canned Fruit in Heavy Syrup in at least the following varieties: Pineapple Slices (20 oz. and 8.25 oz.), Pineapple Chunks (20 oz. and 8.25 oz.), Crushed Pineapple (20 oz. and 8.25 oz.), and Mango Slices (15.5 oz.).

35.    Despite that 40-55% of calories per serving come from FA Sugar, the packaging of the Canned Fruit in Juices makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Vitamin C is an antioxidant that helps support a healthy immune system."

*Label – Front & Side (20 oz. cans)*




*Label – Front & Side (15.5 oz. can)*




*Label – Front (8.25 oz. cans)*



*Label – Sides (8.25 oz. cans)*



### 6.    Canned Fruit in Light Syrup

36.    During the relevant time period, Dole has sold Canned Fruit in Light Syrup in at least the following varieties: Mandarin Oranges in Light Syrup (15 oz.) and Tropical Fruit in Light Syrup and Passion Fruit Juice (15.25 oz.).

37.    Despite that 49-52% of calories per serving come from FA Sugar, the packaging of the Canned Fruit in Light Syrup makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Vitamin C is an antioxidant that helps support a healthy immune system." [on the Tropical Fruit variety]

1

*Label – Front & Side (15 oz. can)*

2
3
4
5
6
7
8
9
10
11
12
13
14



15

*Label – Front & Side (15.25 oz. can)*

16
17
18
19
20
21
22
23
24
25
26
27
28



### 7.     Canned Fruit Juices

38.     During the relevant time period, Dole has sold Canned Fruit Juices in at least the following varieties: Pineapple, Pineapple Mango, Pineapple Orange, and Pineapple Orange Banana. These are sold in multi-packs of 6 oz. cans. The Pineapple variety is also sold in multi-packs of 8.4 oz. cans and individual 46 oz. cans.

39.     Despite that 88-96% of calories per serving come from FA Sugar, the packaging of the Canned Fruit Juices makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Vitamin C is an antioxidant that helps support a healthy immune system."

### *Multi-Pack Outer Packaging – Front*



*Broussard et al. v. Dole Packaged Foods, LLC*, No. 3:23-cv-3320

CLASS ACTION COMPLAINT

**Multi-Pack Outer Packaging – Back**



**Individual Can – Front & Side (46oz.)**



### 8.    Fruitify Beverages

40.    During the relevant time period, Dole has sold Fruitify beverages in at least the following varieties: Replenish Pineapple Juice and Coconut Water, Energize Pineapple Juice With Green Tea Extract, and Glow Pineapple and Mango Juice with Turmeric. These are sold in four-packs of 8 oz. cans.

41.    Despite that 91-93% of calories per serving come from FA Sugar, the packaging of all varieties of the Fruitify beverages makes the following representations stating or suggesting the product is healthy and nutritious:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Vitamin C to support a healthy immune system."

***Outer Packaging – Front & Side***




42.    In sum, through both on-label and off-label advertising, Dole tells consumers the Products are healthy and beneficial to health. Dole does this despite knowing that nutritious foods do not contain processed, FA Sugars like those in the Products.

**II.   CONSUMING FA SUGAR IS DETRIMENTAL TO HEALTH**

   **A.   Free and Added Sugar Act in An Identical Manner Physiologically**

43.   Scientific evidence demonstrates that free sugars act in a physiologically identical manner to added sugars.

44.   A "free sugar" is any sugar added to a food or drink or that is already in honey, syrup, and fruit juice. These sugars are "free" because they are not encased in the cells (food matrix) of the food that we eat. Free sugar excludes only sugars naturally occurring in *intact* fruits, vegetables, or dairy products.

45.   The harmful effect of free sugar comes in large part from the fact that it is not encased in the food matrix (including being bound in fiber), and therefore can hit the bloodstream very quickly when consumed. Accordingly, organizations like the WHO, strongly recommend "limiting the consumption of foods and drinks containing high amounts of sugars and sugar-sweetened beverages (i.e. all types of beverages containing free sugars – these include carbonated or non-carbonated soft drinks, fruit or vegetable juices and drinks)."[14]

46.   "Added sugar" is a subset of free sugar that includes sugar added to foods during processing or preparation, such as brown sugar, sucrose, honey, invert sugar, molasses, and fruit juice concentrates. But under some definitions (as relevant here) it does not include sugar in fruit juice.

47.   Thus, added sugars are a subset of free sugars, meaning all added sugars are free sugars, though not all free sugars are added sugars.

48.   This definitional distinction, however, is merely semantical. "The existence of these different ways of classifying sugars in foods and beverages in authoritative dietary guidance and nutrition communication implies that the distinctions are deemed to be physiologically relevant. But physiologic differentiation between these classes [of sugars] arise[s] mainly from effects of the [food] matrix in which the sugars are found. For example, it has often been shown that the acute metabolic impact is lower . . . for intact fruit than for the comparable fruit juices, the latter having effects more similar to other sugar-sweetened beverages (SSBs)."[15]

---

[14] https://www.who.int/news-room/fact-sheets/detail/healthy-diet

[15] Mela, David J. et al., *Perspective: Total, Added, or Free? What Kind of Sugars Should We Be Talking About?*, ADV. NUTR. 9(2): 63-69 (Apr. 7, 2018) [hereinafter "Mela, Sugar Perspective"].

49.     The food matrix is "the nutrient and non-nutrient components of foods and their molecular relationships, i.e., chemical bonds, to each other."[16]  The food matrix may be viewed as a physical domain that contains and/or interacts with specific constituents of a food (e.g., a nutrient) providing functionalities and behaviors which are different from those exhibited by the components in isolation or a free state. It is, quite literally, the physical geometry of the food.[17] The effect of the food matrix ("FM-effect") has profound implications in food processing, oral processing, satiation, and satiety, and, most relevant here, digestion in the gastrointestinal tract.[18]  The effect of the food matrix also explains the counterintuitive reality that consuming two foods with the same chemical composition may lead to significantly different outcomes for health based on their chemical structures.

50.     When fruit is processed into juice like those used in Dole's Fruit Bowls in Juice, Fridge Packs, and Fruitify Beverages, that processing destroys the food matrix. And because of the negative health effects of consuming FA Sugar, a piece of fruit, while perhaps a healthy food choice when it is whole, is transformed into a decidedly *un*healthy food once processed into juice.[19] Thus, "the term 'free sugars' best conveys the nature and sources of dietary sugars that are most consistently related to risks of positive energy balance, and that are also associated with diabetes and dental caries."[20]

51.     Susan Jebb, Professor of Diet and Population at Cambridge University, has explained that many "people believe fruit juices . . .  have about the same effects as eating fruit. Unfortunately, this is wrong . . . ."  This is because processing intact fruit destroys the fruits' natural food matrix thereby concentrating and releasing the fruit's sugar, which "'is absorbed very fast, so by the time it gets to your

---

[16]  United States Department of Agriculture, NAL Agricultural Thesaurus, *available at* https://lod.nal.usda.gov/nalt/17238.

[17] Aguilera, J., *The food matrix: implications in processing, nutrition and health*, Crit. Rev. Food Sci. Nutr. 2019; 59(22) 3612-3629 (Sept. 10, 2018).

[18] *Id*.

[19] *See* Mela, Sugar Perspective, *supra* n.15.

[20] *Id*.

stomach your body doesn't know whether it's Coca-Cola or orange juice[.]'"[21]

52.    Likewise, Dr. Robert Lustig, a professor emeritus of Pediatrics, Division of Endocrinology at the University of California, San Francisco, explains, juice is "as egregious a delivery vehicle for sugar as is soda. Studies of juice consumption show increased risk of diabetes and heart disease even after controlling for calories . . . ."[22]

53.    Because the free sugar in juice acts physiologically identically to the added sugars in beverages, studies have found, for example, "drinking fruit juice every day . . . increase[es] the chances of diabetes by 21 percent."[23]

---

[21]    "Don't Fall for the Juice Trap," *Apartments For Us* (Oct. 15, 2018), https://www.apartmentsforus.com/dont-fall-for-the-fruit-juice-trap/ (Ms. Jebb accordingly cautioned consumers, "don't fall for the fruit juice trap and don't believe the hype that it's a good addition to a balanced meal."). *See also* Saner, Emine, "How fruit juice went from health food to junk food," *The Guardian* (Jan. 17, 2014), available at https://www.theguardian.com/lifeandstyle/2014/jan/17/how-fruit-juice-health-food-junk-food (quoting Ms. Jebb).

[22] Lustig, Robert H., MD, MSL, Metabolical: The Lure and the Lies of Processed Food, Nutrition, and Modern Medicine, 259-60 (Harper Wave 2021).

[23] McClusky, Joan, "The Whole Truth About Whole Fruits," *Medical Xpress* (May 31, 2017), https://medicalxpress.com/news/2017-05-truth-fruits.html. *See also* Muraki, I., et al., *Fruit consumption and risk of type 2 diabetes: results from three prospective longitudinal cohort studies*, BMJ (Aug. 2013) ("greater consumption of fruit juice is associated with a higher risk [of type 2 diabetes]"); Bazzano, L.A., et al., *Intake of fruit, vegetables, and fruit juices and risk of diabetes in women*, DIABETES CARE, Vol. 31, 1311-17 (2008) ("cohort study of 71,346 women from the Nurses' Health Study followed for 18 years showed that those who consumed 2 to 3 apple, grapefruit, or orange juices per day (280-450 calories and 75-112.5 grams of sugar) had an 18% greater risk of type 2 diabetes than women who consumed less than 1 sugar-sweetened beverage per month"); Drouin-Chatier, J., et al., *Changes in Consumption of Sugary Beverages and Artificially Sweetened Beverages and Subsequent Risk of Type 2 Diabetes: Results From Three Large Prospective U.S. Cohorts of Women and Men*, DIABETES CARE, Vol. 42, pp. 2181-89 (Dec. 2019) (finding that increasing sugary beverage intake—which included both sugar-sweetened beverages and fruit juice—by half-a-serving per day over a 4-year period was associated with a 16% greater risk of type 2 diabetes); Imamura, F., et al., *Consumption of sugar sweetened beverages, artificially sweetened beverages, and fruit juice and incidence of type 2 diabetes: systematic review, meta-analysis, and estimation of population attributable fraction*, BMJ, Vol. 351 (2015) (meta-analysis of 17 prospective cohort studies showed higher consumption of fruit juice was associated with a 7% greater incidence of type 2 diabetes); World Health Organization, "WHO urges global action to curtail consumption and health impacts of sugary drinks," (Oct. 11, 2016), *available at* https://www.who.int/news/item/11-10-2016-who-urges-global-action-to-curtail-consumption-and-health-impacts-of-sugary-drinks ("Consumption of free sugars, including products like sugary drinks, is a major factor in the global increase of people suffering from obesity and diabetes[.]")

54.     Likewise, consuming juice increases risk of cardiovascular diseases[24] and all-cause mortality.[25]

## B.     FA Sugar Consumption is Associated with Increased Risk of Cardiovascular Heart Disease and Mortality

55.     Data obtained from NHANES surveys demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[26]

56.     The NHANES analysis also found "a significant association between sugar-sweetened beverage consumption and risk of CVD mortality," with an average 29% greater risk of CVD mortality "when comparing participants who consumed 7 or more servings/wk . . . with those who consumed 1 serving/wk or less . . . ."[27]

---

[24] Hansen, L., et al., *Fruit and vegetable intake and risk of acute coronary syndrome*, BRITISH J. OF NUTR., Vol. 104, p. 248-55 (2010) (finding "a tendency towards a lower risk of ACS [acute coronary syndrome] . . . for both men and women with higher fruit and vegetable consumption," but "a higher risk . . . among women with higher fruit juice intake[.]"); Pase, M.P., et al., *Habitual intake of fruit juice predicts central blood pressure*, APPETITE, Vol. 84, p. 658-72 (2015) (people who consumed juice daily, rather than rarely or occasionally, had significantly higher central systolic blood pressure, a risk factor for cardiovascular disease").

[25] Collin, L.J., et al., *Association of Sugary Beverage Consumption With Mortality Risk in US Adults: A Secondary Analysis of Data From the REGARDS Study*, JAMA NETWORK OPEN, Vol. 2, No. 5 (May 2019) (cohort study of 13,440 black and white adults 45 years and older, observed for a mean of 6 years, each additional 12-oz serving per day of fruit juice was associated with a 24% higher all-cause mortality risk). *See also* Thomas, Liji, MD, "Differences Between Natural Whole Fruit and Natural Fruit Juice," *News Medical Life Sciences* (last updated Feb. 27, 2019), https://www.news-medical.net/health/Differences-Between-Natural-Whole-Fruit-and-Natural-Fruit-Juice.aspx ("In one study, increased fruit juice consumption in early life led to a higher risk of obesity and shorter adult height.").

[26] Yang, Quanhe, et al., *Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults*, JAMA, at E4-5 (pub. online, Feb. 3, 2014).

[27] *Id.* at E6.

57.     In a study of preschool children published in January 2020, researchers found that higher consumption of sugar-containing beverages was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[28]

58.     In another prospective cohort study, consumption of sugary beverages was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[29]

59.     Sugar-sweetened beverage consumption is also associated with several CHD risk factors. For example, consumption of sugary beverages has been associated with dyslipidemia,[30] obesity,[31] and increased blood pressure.[32]

**C.     FA Sugar Consumption is Associated with Increased Risk of Type 2 Diabetes**

60.     Diabetes affects 25.8 million Americans, and can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is

---

[28] Eny, KM, et al., *Sugar-containing beverage consumption and cardiometabolic risk in preschool children*, PREV. MED. REPORTS 17 (Jan. 14, 2020).

[29] Koning, L.D., et al., *Sweetened Beverage Consumption, Incident Coronary Heart Disease, and Biomarkers of Risk in Men*, CIRCULATION, Vol. 125, pp. 1735-41 (2012).

[30] Elliott S.S., et al., *Fructose, weight gain, and the insulin resistance syndrome*, AM. J. CLIN. NUTR., Vol. 76, No. 5, pp. 911-22 (2002).

[31] Faith, M.S., et al., *Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction*, PEDIATRICS, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., *Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women*, JAMA, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"]; Ludwig, D.S., et al., *Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis*, LANCET, Vol. 257, pp. 505-508 (2001); Dennison, B.A., et al., *Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity*, PEDIATRICS, Vol. 99, pp. 15-22 (1997).

[32] *See* Hoare, E., et al., *Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk*, NUTR., Vol. 9, No. 10 (2017); Pase, M.P., et al., *Habitual intake of fruit juice predicts central blood pressure*, 84 APPETITE 658 (2015) (finding those who consumed juice daily, rather than rarely or occasionally, had significantly higher central systolic blood pressure).

strongly associated with coronary artery disease and Alzheimer's disease.[33]

61.     In 2010, Harvard researchers performed a meta-analysis of 8 studies concerning sugar-sweetened beverage consumption and risk of type 2 diabetes, involving a total of 310,819 participants. They concluded that individuals in the highest quantile of SSB intake had an average 26% greater risk of developing type 2 diabetes than those in the lowest quantile.[34] Moreover, "larger studies with longer durations of follow-up tended to show stronger associations."[35] Thus, the meta-analysis showed "a clear link between SSB consumption and risk of . . . type 2 diabetes."[36]

62.     An analysis of data for more than 50,000 women from the Nurses' Health Study,[37] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day (equivalent to 140-150 calories and 35-37.5 grams of added sugar), had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month, and women who consumed 1 or more fruit punch drinks per day had a 100% greater relative risk of type 2 diabetes.[38] The result of this analysis shows a statistically significant linear trend with increasing sugar consumption.[39]

---

[33] Araneta Bartrina, J. et al., *Association between sucrose intake and cancer: a review of the evidence*, NUTRICIÓN HOSPITALARIA, Vol. 28 (Suppl. 4), 95-105 (2013); Garcia-Jimenez, C., *A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose*, J. OF MOLECULAR ENDOCRINOLOGY, Vol. 52, No. 1 (2014); Linden, G.J., *All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study*, J. OF CLIN. PERIODONTAL, Vol. 39, No. 1, 940-46 (Oct. 2012).

[34] Malik, Vasanti S., et al., *Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes*, DIABETES CARE, Vol. 33, No. 11, 2477-83, at 2477, 2480 (Nov. 2010) [hereinafter "Malik, 2010 Meta-Analysis"].

[35] *Id.* at 2481.

[36] *Id.*

[37] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *available at* http://www.channing.harvard.edu/nhs.

[38] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.31.

[39] Hu, F.B., et al., *Sugar-sweetened beverages and risk of obesity and type 2 diabetes: Epidemiologic evidence*, PHYSIO. & BEHAV., Vol. 100, 47-54 (2010).

**Fig. 4.** Multivariate relative risks (RRs) of type 2 diabetes according to sugar-sweetened soft drink consumption in the Nurses' Health Study II 1991–1999 (Multivariate RRs were adjusted for age, alcohol (0, 0.1–4.9, 5.0–9.9, 10+ g/d), physical activity (quintiles), family history of diabetes, smoking (never, past, current), postmenopausal hormone use (never, ever), oral contraceptive use (never, past, current), intake (quintiles) of cereal fiber, magnesium, trans fat, polyunsaturated:saturated fat, and consumption of sugar-sweetened soft drinks, diet soft drinks, fruit juice, and fruit punch (other than the main exposure, depending on model). The data were based on Ref. [50]).

63.     A prospective cohort study of more than 43,000 African American women between 1995 and 2001 showed that the incidence of type 2 diabetes was higher with higher intake of both sugar-sweetened soft drinks and fruit drinks. After adjusting for confounding variables, those who drank 2 or more soft drinks per day (*i.e.*, 140-300 calories and 35-75 grams of added sugar) showed a 24% greater risk of type 2 diabetes, and those who drank 2 or more fruit drinks per day showed a 31% greater risk of type 2 diabetes, than those who drank 1 or less such drinks per month.[40]

64.     A large cohort study of 71,346 women from the Nurses' Health Study followed for 18 years showed that those who consumed 2 to 3 apple, grapefruit, and orange juices per day (280-450 calories and 75-112.5 grams of added sugar) had an 18% greater risk of type 2 diabetes than women who consumed less than 1 sugar-sweetened beverage per month. The data also showed a linear trend with increased consumption, as demonstrated below.[41]

---

[40] Palmer, J.R., et al., *Sugar-Sweetened Beverages and Incidence of Type 2 Diabetes Mellitus in African American Women*, ARCH INTERN MED., Vol. 168, No. 14, 1487-82 (July 28, 2008) [hereinafter "Palmer, Diabetes in African American Women"].

[41] Bazzano, L.A., et al., *Intake of fruit, vegetables, and fruit juices and risk of diabetes in women*, DIABETES CARE, Vol. 31, 1311-17 (2008).

1
2
3
4
5
6
7
8
9
10



**Figure 1—**Multivariate-adjusted relative hazard of diabetes by category of cumulatively updated fruit juice intake. Values were adjusted for cumulatively updated BMI, physical activity, family history of diabetes, postmenopausal hormone use, alcohol use, smoking, and total energy intake. For an increase of 1 serving/day of fruit juice, the multivariate-adjusted relative risk was 1.18 (95% CI 1.10–1.26; P < 0.0001).

11    65.    An analysis of more than 40,000 men from the Health Professionals Follow-Up Study, a
12 prospective cohort study conducted over a 20-year period, found that, after adjusting for age and a wide
13 variety of other confounders, those in the top quartile of sugar-sweetened beverage intake had a 24% greater
14 risk of type 2 diabetes than those in the bottom quartile, while consumption of artificially-sweetened
15 beverages, after adjustment, showed no association.[42]

16    66.    In an analysis of tens of thousands of subjects from three prospective longitudinal cohort
17 studies (the Nurses' Health Study, Nurses' Health Study II, and Health Professionals Follow-up Study),
18 researchers found, after adjusting for BMI, initial diet, changes in diet, and lifestyle covariates, that increasing
19 sugary beverage intake—which included both sugar-sweetened beverages and fruit juice—by half-a-serving
20 per day over a 4-year period was associated with a 16% greater risk of type 2 diabetes.[43]

21    67.    An econometric analysis of repeated cross-sectional data published in 2013 established a
22 causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of
23 confounding factors, researchers found that an increase of 150 calories per day related to an insignificant
24

25 [42] de Konig, L., et al., *Sugar-sweetened and artificially sweetened beverage consumption and risk of type 2*
26 *diabetes in men*, AM. J. OF CLIN. NUTR., Vol. 93, 1321-27 (2011).

27 [43] Drouin-Chatier, J., et al., *Changes in Consumption of Sugary Beverages and Artificially Sweetened*
*Beverages and Subsequent Risk of Type 2 Diabetes: Results From Three Large Prospective U.S. Cohorts of*
28 *Women and Men*, DIABETES CARE, Vol. 42, pp. 2181-89 (Dec. 2019).

0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically-significant 11-fold difference.[44]

68.    There are many other scientific studies, of which the average consumer is unaware, that demonstrate consuming drinks with added sugar directly harms blood sugar levels. One large meta-analysis that included data from 34,748 adults, for example, found that "after adjustment for age, sex, energy intake, BMI and other dietary covariates, each additional serving of [sugar sweetened beverage] intake was associated with higher *fasting* glucose"[45] blood levels, which is unhealthy. This in turn leads to "higher fasting insulin"[46] levels, which can cause insulin resistance. In fact, studies have shown that "Regular SSB [sugar-sweetened beverage] intake . . . is associated with a greater increase in insulin resistance and a higher risk of developing prediabetes in a group of middle-aged adults."[47]

69.    Another study "aimed to evaluate the relationship between the consumption of selected food groups and insulin resistance, with an emphasis on sugar-sweetened beverages (SSB)" it found that "daily consumption of SSB was related with increased [homeostasis model assessment-insulin resistance] in adolescents."[48]

70.    Yet another study examining "the association between sugar-sweetened beverage (SSB) consumption with biomarkers of insulin resistance (IR)" found that "[a]dolescents who consumed a greater amount of SSBs were more likely to have elevated fasting serum insulin[.]"[49]

---

[44] Basu, S., et al., *The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data*, PLOS ONE, Vol. 8, Issue 2 (Feb. 27, 2013).

[45] McKeown, N.M. et al., *Sugar-Sweetened Beverage Intake Associations with Fasting Glucose and Insulin Concentrations Are Not Modified by Selected Genetic Variants in a ChREBP-FGF21 Pathway: A Meta-Analysis*, 61 DIABETOLOGIA 317–330 (2018) (emphasis added).

[46] *Id.*

[47] Ma, J. et al., *Sugar-Sweetened Beverage but Not Diet Soda Consumption Is Positively Associated with Progression of Insulin Resistance and Prediabetes*, 146 J. NUTR. 2544–2550 (2016).

[48] Kondaki, K. et al., *Daily Sugar-Sweetened Beverage Consumption and Insulin Resistance in European Adolescents*, 16 PUB. HEALTH NUTR. 479–486 (2013).

[49] Lin, W.-T. et al., *Fructose-Rich Beverage Intake and Central Adiposity, Uric Acid, and Pediatric Insulin Resistance*, 171 J. PED. 90–96 (2016).

71.     Another study found that "SSB supplementation led to a significant increase in fasting plasma glucose and a strong trend towards a reduction in insulin sensitivity in healthy lean individuals with low physical activity, who otherwise consumed less than 500 mL SSB per week."[50]

72.     In short, there is "a clear link between [sugar sweetened beverage] consumption," like many of the Products challenged here, "and risk of . . . type 2 diabetes."[51]

**D.     FA Sugar Consumption is Associated with Metabolic Disease**

73.     Excess added sugar consumption leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of added sugar can overwhelm the liver, which metabolizes the fructose in the sugar. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[52]

74.     Metabolic disease has been linked to type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease, and is defined as the presence of any three of the following:

      a.     Large waist size (35" or more for women, 40" or more for men);

      b.     High triglycerides (150mg/dL or higher, or use of cholesterol medication);

      c.     High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men;

      d.     High blood pressure (135/85 mm or higher); or

---

[50] Sartor F et al., *Adaptive metabolic response to 4 weeks of sugar-sweetened beverage consumption in healthy, lightly active individuals and chronic high glucose availability in primary human myotubes*, 52(3) EURO. J. NUTR. 937-48 (Apr. 2013). *See also* Teshima N et al., *Effects of sugar-sweetened beverage intake on the development of type 2 diabetes mellitus in subjects with impaired glucose tolerance: the Mihama diabetes prevention study*, 61(1) J. NUTR. SCI. VITAMINOL. 14-9 (2015) ("SSB intake correlated with the predisposition for developing T2DM, possibly by influencing body weight, insulin resistance, and the ability of the pancreatic beta cells to effectively compensate for the insulin resistance").

[51] Malik, 2010 Meta-Analysis, *supra* n.34, at 2477, 2480-81.

[52] Te Morenga, L., et al., *Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies*, BJM (Jan. 2013) [hereinafter, "Te Morenga, Dietary Sugars & Body Weight"].

e.    High blood sugar (100mg/dL or higher).

75.    More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[53]

76.    Fifty-six million Americans have metabolic syndrome, or about 22.9% of Americans over the age of 20, placing them at higher risk for chronic disease.

77.    In 2010, Harvard researchers published a meta-analysis of three studies, involving 19,431 participants, concerning the effect of consuming sugar-sweetened beverages on risk for metabolic syndrome. They found participants in the highest quantile of 1-2 servings per day had an average 20% greater risk of developing metabolic syndrome than did those in the lowest quantile of less than 1 serving per day, showing "a clear link between SSB consumption and risk of metabolic syndrome . . . ."[54]

78.    Researchers who studied the incidence of metabolic syndrome and its components in relation to soft drink consumption in more than 6,000 participants in the Framingham Heart Study found that individuals who consumed 1 or more soft drinks per day had a 48% higher prevalence of metabolic syndrome than infrequent consumers, those who drank less than 1 soft drink per day. In addition, the frequent-consumer group had a 44% higher risk of developing metabolic syndrome.[55]

**E.    FA Sugar Consumption is Associated with Liver Disease**

79.    Sugar-sweetened beverage consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which

---

[53] Fried, S.K., *Sugars, hypertriglyceridemia, and cardiovascular disease*, AM. J. OF CLIN. NUTR., Vol. 78 (suppl.), 873S-80S, at 873S (2003).

[54] Malik, 2010 Meta-Analysis, *supra* n.34, at 2477, 2480-81.

[55] Dhingra, R., et al., *Soft Drink Consumption and Risk of Developing Cardiometabolic Risk Factors and the Metabolic Syndrome in Middle-Aged Adults in the Community*, CIRCULATION, Vol. 116, 480-88 (2007).

gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[56]

80.    Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to NASH-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[57]

81.    Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing for the first time alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children, suffer from NAFLD.[58]

**F.    FA Sugar Consumption is Associated with Increased Risk of Obesity**

82.    Excess FA Sugar consumption leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess weight can then exacerbate the problems of excess FA Sugar consumption, because excess fat, particularly around the waist, is in itself a primary cause of insulin resistance, creating a vicious cycle. Studies have shown that belly fat produces hormones and other substances that can cause insulin resistance, high blood pressure, abnormal cholesterol levels, and cardiovascular disease. And belly fat plays a part in the development of chronic inflammation in the body, which can cause damage over time, and without any signs or symptoms.

---

[56] Farrell, G.C., et al., *Nonalcoholic fatty liver disease: from steatosis to cirrhosis*, HEPATOLOGY, Vol. 433, No. 2 (Suppl. 1), S99-S112 (Feb. 2006); Powell, E.E., et al., *The Natural History of Nonalcoholic Steatohepatitis: A Follow-up Study of Forty-two Patients for Up to 21 Years*, HEPATOLOGY, Vol. 11, No. 1 (1990).

[57] Charlton, M.R., et al., *Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States*, GASTROENTEROLOGY, Vol. 141, No. 4, 1249-53 (Oct. 2011).

[58] Lindback, S.M., et al., *Pediatric Nonalcoholic Fatty Liver Disease: A Comprehensive Review*, ADVANCES IN PEDIATRICS, Vol. 57, No. 1, 85-140 (2010); Lazo, M. et al., T*he Epidemiology of Nonalcoholic Fatty Liver Disease: A Global Perspective*, SEMINARS IN LIVER DISEASE, Vol. 28, No. 4, 339-50 (2008); Schwimmer, J.B., et al., *Prevalence of Fatty Liver in Children and Adolescents*, PEDIATRICS, Vol. 118, No. 4, 1388-93 (2006); Browning, J.D., et al., *Prevalence of hepatic steatosis in an urban population in the United States: impact of ethnicity*, HEPATOLOGY, Vol. 40, No. 6, 1387-95 (2004).

83.     A recent meta-analysis by Harvard researchers evaluating change in Body Mass Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive association between beverage intake and weight gain.[59]

84.     One study of more than 2,000 2.5-year-old children followed for 3 years found that those who regularly consumed sugar-sweetened beverages between meals had a 240% better chance of being overweight than non-consumers.[60]

85.     An analysis of data for more than 50,000 women from the Nurses' Health Study during two 4-year periods showed that weight gain over a 4-year period was highest among women who increased their sugar-sweetened beverage consumption from 1 or fewer drinks per week, to 1 or more drinks per day (8.0 kg gain during the 2 periods), and smallest among women who decreased their consumption or maintained a low intake level (2.8 kg gain).[61]

86.     A study of more than 40,000 African American women over 10 years had similar results. After adjusting for confounding factors, those who increased sugar-sweetened beverage intake from less than 1 serving per week, to more than 1 serving per day, gained the most weight (6.8 kg), while women who decreased their intake gained the least (4.1 kg).[62]

87.     Experimental short-term feeding studies comparing sugar-sweetened beverages to artificially-sweetened beverages have shown that consumption of the former leads to greater weight gain. In one 10-week trial involving more than 40 men and women, the group that consumed daily supplements of sucrose (for 28% of total energy) increased body weight and fat mass—by 1.6 kg for men and 1.3 kg for women—while the group that was supplemented with artificial sweeteners lost weight—1.0 kg for men and 0.3 kg for women.[63]

---

[59] Malik, V.S., et al., *Sugar-sweetened beverages and BMI in children and adolescents: reanalyses of a meta-analysis*, AM. J. CLIN. NUTR., Vol. 29, 438-39 (2009).

[60] Dubois, L., et al., *Regular sugar-sweetened beverage consumption between meals increases risk of overweight among preschool-aged children*, J. AM. DIET ASSOC., Vol. 107, Issue 6, 924-34 (2007).

[61] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.35.

[62] Palmer, Diabetes in African American Women, *supra* n.40.

[63] Raben, A., et al., *Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects*, 76 AM. J. CLIN. NUTR. 721 (2002).

**G.    FA Sugar Consumption is Associated with Impaired Immune System Function**

88.    The scientific literature also demonstrates that consumption of FA Sugar has deleterious effects on immune system function.

89.    First, neutrophils are the most common type of white blood cell (leukocytes), and they act as the immune system's first line of defense. Neutrophils ordinarily protect the body by traveling to the source of an infection or pathogen where they digest and destroy invading microorganisms. But consuming sugar-sweetened beverages like in the challenged Products causes blood sugar to rise quickly. This in turn activates an enzyme called protein kinase C, which leads to dysfunction in neutrophils, significantly reducing the ability of this important part of the immune system to protect the body and fight off infection.[64]

90.    Second, high blood sugar is associated with the inability of immune cells to properly "tag" foreign pathogens so they can be destroyed.[65]

91.    Third, high blood sugar contributes to multiple defective immune responses, including a decrease in IL-6, a chemical messenger necessary for a proper immune response.[66]

92.    In short, consuming products with FA Sugar impairs rather than supports immune system function.

**H.    FA Sugar Consumption is Associated with Increased All-Cause Mortality**

93.    In a cohort study of 13,440 adults 45 years and older, observed for a mean of 6 years, each additional 12-oz serving per day of a sugary beverage was associated with a 11% higher all-cause mortality risk. The researchers from Emory University, University of Alabama, and the Weill Cornell Medical College concluded their findings "suggest that consumption of sugary beverages, including fruit juices, is associated with all-cause mortality."[67]

---

[64] Jafar N., et al., *The Effect of Short-Term Hyperglycemia on the Innate Immune System*, 351(2) AM. J. MED. SCI. 201 (Feb. 2016).

[65] Hostetter, M., *Handicaps to Host Defense: Effects of Hyperglycemia on C3 and Candida albicans*, 39(3) DIABETES 271 (Mar. 1990).

[66] Spindler M.P. et al., *Acute hyperglycemia impairs IL-6 expression in humans*, 4(1) IMMUN. INFLAMM. DIS. 91 (Jan. 2016).

[67] Collin, L.J., et al., *Association of Sugary Beverage Consumption With Mortality Risk in US Adults: A Secondary Analysis of Data From the REGARDS Study*, JAMA NETWORK OPEN, Vol. 2, No. 5 (May 2019).

**I.    Because of the Scientific Evidence of FA Sugar's Health Harms, Authoritative Bodies Recommend Excluding or Substantially Minimizing FA Sugar Consumption**

94.    The World Health Organization (WHO) recommends that no more than 10% of calories, and ideally less than 5%, come from FA Sugar.[68] Additionally, WHO expressly advises "limiting the consumption of . . . sugar-sweetened beverages (i.e. all types of beverages containing free sugars – these include carbonated or non-carbonated soft drinks, fruit or vegetable juices and drinks . . . .)"[69]

95.    The American Heart Association (AHA) recommends restricting added sugar to 5% of calories consumed per day.[70] Based on the average caloric needs, this equates to 12 grams daily for children 4 to 8 years old, 25 grams daily for children 9 to 18 years old, 25 grams for women, and 38 grams for men.

96.    The Food and Drug Administration (FDA) has adopted the United States Department of Agriculture's daily reference value (DRV) of 50 grams of added sugar, or 10% of calories based on a 2,000-calorie diet. 81 Fed. Reg. 33742, 33820 (May 27, 2016). While the FDA acknowledged the AHA and WHO recommendations to keep added sugars below 5% of calories, it set the DRV at 50 grams or 10% because this was "more realistic considering current consumption of added sugars in the United States as well as added sugars in the food supply." *Id.* at 33,849. Nevertheless, the FDA's rulemaking was based, in part, on the 2015 Dietary Guidelines Advisory Committee's "food pattern analysis," which—consistent with the AHA and WHO recommendations—"demonstrate[d] that when added sugars in foods and beverages exceeds 3% to 9% of total calories . . . a healthful food pattern may be difficult to achieve . . . ."[71]

97.    The Scientific Report of the 2020 Dietary Guidelines Advisory Committee was even stricter than what the USDA and Department of Health and Human Services ultimately adopted, "suggest[ing] that

---

[68] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet (reduction of FA Sugar "to below 5% . . . per day would provide additional health benefits).

[69] *Id.*

[70] Johnson, R.K., et al., on behalf of the American Heart Association Nutrition Committee of the Council on Nutrition, Physical Activity, and Metabolism and Council on Epidemiology and Prevention, *Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the American Heart Association*, CIRCULATION, Vol. 120, 1011-20, at 1016-17 (2009).

[71] U.S. Department of Agriculture, "Scientific Report of the 2015 Dietary Guidelines Advisory Committee," Ch. 6 p.26 (February 2015).

less than 6 percent of energy from added sugars is more consistent with a dietary pattern that is nutritionally adequate . . . than is a pattern with less than 10 percent energy from added sugars."[72]

98.    The Heart and Stroke Foundation, in explaining "healthy eating basics," recommends "avoid[ing] sugary drinks."[73]

99.    The Centers for Disease Control and Prevention warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease" and that "[s]ugary drinks are the leading source of added sugars in the American diet."[74]

100.    The Harvard School of Public Health points out that "the Healthy Eating Pyramid says sugary drinks and sweets should be used sparingly, if at all, and the Healthy Eating Plate does not include foods with added sugars."[75]

101.    In September 2019, the American Academy of Pediatrics, the American Heart Association, the Academy of Nutrition and Dietetics, and the American Academy of Pediatric Dentistry published a consensus statement on young children's consumption of drinks, recommending no 100% fruit juice for ages 0-12 months, no more than 4 ounces per day for ages 1-3 years, and no more than 4 to 6 ounces per day for ages 4-5 years.[76]

102.    Overall, "[l]imiting SSBs has been widely promulgated by public health policy and scientific documents as a prudent strategy for promoting optimal nutrition and health."[77]

---

[72] U.S. Department of Agriculture, "Scientific Report of the 2020 Dietary Guidelines Advisory Committee" (2020), Part A, p. 11.

[73] Heart and Stroke Foundation, "Healthy eating basics," https://www.heartandstroke.ca/healthy-living/healthy-eating/healthy-eating-basics.

[74] Centers for Disease Control and Prevention, "Know Your Limit for Added Sugars," https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[75] Harvard T.H. Chan School of Public Health, "Added Sugar," *The Nutrition Source* (2022), *available at* https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet/.

[76] Lott, M., et al., "*Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations. Consensus Statement*," HEALTHY EATING RESEARCH (Sept. 2019), *available at* https://healthyeatingresearch.org/research/consensus-statement-healthy-beverage-consumption-in-early-childhood-recommendations-from-key-national-health-and-nutrition-organizations/.

[77] Zheng, M., et al., *Substitution of SSB with other beverage alternatives: a review of long-term health outcomes*, J. ACAD. NUTR. DIET. vol. 115,5 (2015).

III.    **DOLE'S REPRESENTATIONS AND OMISSIONS ARE FALSE AND MISLEADING**

A.    **Dole's Health & Wellness Claims are Likely to Deceive the Public**

103.    Dole's labeling representations conveying that the Products provide good nutrition, and boost the immune system are directly contrary to the scientific evidence and therefore are false, or at least highly misleading.

104.    First, as the CDC has explained, "[r]esearch has shown that . . . good nutrition can:

- Promote weight management and reduce the risk of obesity
- Reduce the risk of developing high cholesterol, or reduce cholesterol in those who already have high cholesterol
- Reduce the risk of developing Type 2 diabetes, and
- Reduce the risk of developing high blood pressure or reduce blood pressure in those who already have high blood pressure[.]"[78]

105.    Because "good nutrition" promotes health and reduces risk of disease, Dole's "promise to provide everyone, everywhere with good nutrition" is false and misleading because regularly consuming the Products contributes to an *increased* risk of diseases like Type 2 diabetes and heart disease, and detrimentally impacts blood pressure and cholesterol levels, among other harms.

106.    Put another way, a nutritious food is one that both provides beneficial nutrients (e.g. vitamins) and minimizes harmful elements (e.g. sugars).[79] Because the Products are high in FA Sugars, rather than minimizing harmful elements, the Products do not provide good nutrition.

107.    In addition, authoritative bodies like the FDA, WHO, and DGAs recommend limiting FA Sugar consumption to less than 5% or 10% of daily calories for a healthy diet and good nutrition, and less than 5% of calories for a healthy food. Therefore, it is misleading for Dole to represent that its Products are healthy or good nutrition, when between 29% and 96% of the Products' calories come from FA Sugar. Because the Products contain such high levels of FA Sugar, consuming the products actually makes it harder

---

[78] "Nutrition," Centers for Disease Control and Prevention (Mar. 1, 2016), *available at* https://www.cdc.gov/workplacehealthpromotion/health-strategies/nutrition/.

[79] Global Alliance for Improved Nutrition, "What constitutes a nutritious and safe food?," *available at* www.gainhealth.org (Sept. 2017).

or even impossible to stay below the maximum recommended level of FA Sugar consumption. For example, a **single** Fruit Bowl in Gel contains 18g to 20g FA Sugar which is 150% to 166.7% of the daily limit for children 4 to 8 years old, and 72% to 80% of the daily limit for children up to 18 years old. Because consuming the Products makes it harder to maintain a healthy diet (and in some instances impossible), the Products do not constitute good nutrition.

108.    Dole's representation that the Products "support a healthy immune system" is also false and misleading, for two reasons.

109.    First, it reinforces and contributes to Dole's false health and nutrition messaging.

110.    Second, scientific evidence demonstrates that for the average consumer, the high amount of FA Sugar in the Products means that consuming them will impair immune system function. Further, because the average consumer is not vitamin C deficient,[80] the additional vitamin C consumption does not improve immune system function. Thus, contrary to the message conveyed on the Products' labeling, consuming the Products impairs rather than improves immune system function.

111.    Additionally, Dole's Fruit Bowl Parfaits, Fruit Bowls in Gel, Canned Tropical Fruit in Light Syrup and Passion Fruit Juice, and Canned Pineapple Juice are fortified in direct contravention of the FDA's fortification policy. *See* 21 C.F.R. § 104.20. The FDA's Fortification Policy is intended to prevent the "indiscriminate addition of nutrients to foods" because it "could [ ] result in deceptive or misleading claims for certain foods." 21 C.F.R. § 104.20(a). Accordingly, the FDA policy prohibits the fortification of snacks, like the Products.

112.    Because the Dole's Fruit Bowl Parfaits, Fruit Bowls in Gel, Canned Tropical Fruit in Light Syrup and Passion Fruit Juice, and Canned Pineapple Juice get much of their Vitamin C content not from the juice concentrates themselves, but rather from the additive ascorbic acid, in contravention of the FDA's fortification policy, Dole's use of the immune system claims is unfair and deceptive.

---

[80] Although a deficiency of vitamin C due leads to a greater susceptibility to infections studies show that increasing its consumption in a well-nourished population, like that in the United States, does not decrease the incidence of viral diseases. *See* Cerullo G., et al., *The Long History of Vitamin C: From Prevention of the Common Cold to Potential Aid in the Treatment of COVID-19*, 11 FRONT. IMMUNOL. 574029 (2020). *See also* "Second National Report on Biochemical Indicators of Diet and Nutrition in the U.S. Population," The Centers for Disease Control and Prevention, Division of Laboratory Sciences at the National Center for Environmental Health (2012) at p.74 (vitamin C deficiency is "rare in the United States").

113.    The FDA's Fortification Policy is intended to prevent the "indiscriminate addition of nutrients to foods" that "could [ ] result in deceptive or misleading claims for certain foods." 21 C.F.R. § 104.20(a). Dole's Fruit Bowl Parfaits, Fruit Bowls in Gel, Canned Tropical Fruit in Light Syrup and Passion Fruit Juice, and Canned Pineapple Juice are fortified with ascorbic acid,[81] but they are considered snacks because they are high in FA Sugar—and the fortification policy prohibits the fortification of such products. Further, even if the Products were not snacks that the fortification policy categorically prohibits fortification of, there is no rational basis for fortifying the Products as required by the fortification policy. *See* 21 C.F.R. § 104.20(b)-(e).

114.    Not only is the challenged labeling false from a scientific perspective, it is especially likely to mislead consumers because (1) Dole and other packaged food companies have spent billions of dollars on disinformation campaigns regarding the health effects of consuming sugar, and (2) Dole uses nothing on the labeling that would dispel the express representations characterizing the Products as providing good nutrition and supporting the immune system.

115.    For decades, Dole and other packaged food companies have waged a disinformation campaign to hide the danger of FA Sugar consumption. For example, Dole is a member of the Consumer Brands Association. Until recently this industry group was known as the Grocery Manufacturers Association (GMA). In 2015, the GMA submitted public comments to the FDA regarding the FDA's proposed change to the Nutrition Facts panel that would, among other things, list "added sugar" separately from "total sugar." The GMA opposed the change, claiming that "there is scant evidence to support the idea that added sugar contributes to ill health" and therefore "providing this information in a nutrition label will not help aid consumers in maintaining a healthy diet."[82]

116.    But as Marion Nestle (professor of nutrition, food studies, and public health at New York University) has explained, "[a]ttacking the science is the first line of industry defense against

---

[81] Canned Tropical Fruit in Light Syrup and Passion Fruit Juice is also fortified with Vitamin A Palmitate.

[82]    https://blog.ucsusa.org/deborah-bailin/added-sugar-on-the-nutrition-facts-label-public-comments-to-the-fda-show-big-food-is-sour-on-science/.

recommendations that suggest eating less of their products. Food companies are following the lead of cigarette companies in that regard."[83]

117.    "Despite mounting evidence on the harmful effects of excessive sugar consumption, the processed food industry spends billions of dollars each year to mislead consumers and policymakers about added sugar, often targeting vulnerable communities and populations."[84]

118.    In fact, documents that became public during a lawsuit between rival industry groups show that "sugar interests have, in fact, intentionally and actively worked *for more than 40 years* to suppress the scientific evidence linking sugar consumption to negative health consequences."[85]

119.    As one article described it, "[i]nternal US sugar industry documents recently revealed the part that the industry conspiracy with scientists, and by lobbying public institutions, played in the 1960s and 1970s in determining that public health policy to reduce mortality from coronary heart disease should focus on saturated fats as the main cause of such disease whilst ignoring the impact of sugar consumption."[86]

120.    Documents that became public during the course of a lawsuit between rival sugar industry groups revealed that the sugar industry has engaged in "unscrupulous strategies reminiscent of the tobacco and fossil fuel industries, including manufacturing doubt about the science and engaging in deliberate and elaborate misinformation campaigns."[87]

121.    The Union of Concerned Scientists identified five main tactics used by the sugar industry. These include:

    Tactic 1: Attacking the Science

---

[83] *Id.*

[84] https://www.ucsusa.org/resources/ensuring-public-access-unsweetened-facts.

[85] Goldman, G., et al., *Added Sugar, Subtracted Science: How Industry Obscures Science and Undermines Public Health Policy on Sugar*, Center for Science and Democracy at the Union of Concerned Scientists, Chap. 3 (June 2014), *available at* https://www.ucsusa.org/sites/default/files/2019-09/added-sugar-subtracted-science.pdf (emphasis added) ["Goldman, How Industry Obscures"]. *See also* Kearns CE, et al., *Sugar Industry and Coronary Heart Disease Research: A Historical Analysis of Internal Industry Documents*, 176(11) JAMA INTERN MED. 1680 (2016).

[86] Calvillo, A., "Public health sequestered for 50 years by sugar industry," *NCD Alliance* (Sept. 29, 2016), *available at* https://ncdalliance.org/news-events/blog/new-blog-public-health-sequestered-for-50-years.

[87] Goldman, How Industry Obscures, *supra* n.85.

- Planning to "bury the data" if the science is inconvenient

- Threatening to suspend funding to the World Health Organization

- Seeking to discredit scientific findings by intimidating the study authors

Tactic 2: Spreading Misinformation

- Emphasizing unknowns while ignoring what is known

- Repeating untruthful claims

- Manufacturing bogus scientific claims

- Widely publishing claims that have not been subjected to scientific scrutiny

Tactic 3: Deploying industry scientists

- Exploiting science communication and blogging communities

- Failing to disclose scientists' conflicts of interest

- Hijacking scientific language for product promotion

Tactic 4: Influencing academia

- Buying credibility through academic scientists

- Funding research to support their preconceived positions

- Paying academic scientists to persuade other scientists of sugar interests' positions

Tactic 5: Undermining policy

- Pouring lobbying dollars into sugar policy debates at the federal, state, and local levels

- Supporting political candidates in influential positions

- Influencing rule making at federal agencies

122.    In short, food manufacturers including Dole have spent billions on "efforts to neutralize the evidence on sugar's harmful effects through a combination of lobbying, PR, counterfeit science, attacks on opposing scientists, and other deceptive tactics."[88]

---

[88] "Added Sugar: Ensuring Public Access to the Unsweetened Facts," Union of Concerned Scientists (published Apr. 21, 2015, updated Oct. 3, 2016), https://www.ucsusa.org/resources/ensuring-public-access-unsweetened-facts (citing Bailin, et al., *Sugar-Coating Science: How the Food Industry Misleads Consumers on Sugar*, Center for Science and Democracy at the Union of Concerned Scientists (May 2014), *available at* https://www.ucsusa.org/sites/default/files/2019-09/sugar-coating-science.pdf.

123.    The ultimate goal of the disinformation campaigns is to "manufacture doubt"[89] so that consumers do not know what to believe and research shows the efforts have been quite effective in creating misconceptions and confusing consumers.

124.    Survey evidence demonstrates this problem is prevalent regarding nutrition. For example, among the "Key Findings" of the 2018 Food & Health Survey from the International Food Information Council (IFIC), which surveyed approximately 1,000 American consumers to understand their perceptions, beliefs and behaviors around food and food purchasing decisions, was that 80% of the surveyed consumers encountered contradictory information about food and nutrition in their search for nutritious foods, making "consumer confusion . . . a prevalent issue."[90]

125.    Not surprisingly, research consistently shows that consumers have difficulty evaluating the healthfulness of food products. In one survey, each participant was shown a collection of cereal bars and asked to rank them from healthiest to least healthiest. "[O]nly 9% of participants were able to correctly identify which product was the healthiest[.]"[91] "Even more worrying, 13 percent identified the least nutritious food option as the healthiest—more than the amount who properly identified the healthiest."[92] In short, there is "widespread confusion when it comes to determining what is and isn't healthy."[93]

126.    Finally, nothing on the labeling dispels the expressly intended message that the Products are good for you and support the immune system. Looking at the Nutrition Facts, for example, would not

---

[89] *See* Goldberg, R.F. and Vandenberg L.N., *The science of spin: targeted strategies to manufacture doubt with detrimental effects on environmental and public health*, 20(1) ENVIRON. HEALTH 33 (Mar. 2021) (describing how "[n]umerous groups, such as the tobacco industry, have deliberately altered and misrepresented knowable facts and empirical evidence to promote an agenda, often for monetary benefit," including the sugar industry); Goldberg R.F. and Vandenberg L.N., *Distract, display, disrupt: examples of manufactured doubt from five industries*, 34(4) REV. ENVIRON. HEALTH 349 (2019).

[90] "2018 Food & Health Survey," International Food Information Council, at 3, 5, https://foodinsight.org/wp-content/uploads/2018/05/2018-FHS-Report-FINAL.pdf.

[91] *Id.*

[92] *Id.*

[93] Danley, Sam, "Study finds few consumers understand healthy food labels," *Supermarket Perimeter* (Mar. 16, 2022), https://www.supermarketperimeter.com/articles/7888-study-finds-few-consumers-understand-healthy-food-labels.

necessarily lead consumers to believe that the Products harm health and impair the immune system because to discover the truth, consumers would have to look beyond the label and perform their own research.

127.   And while the Nutrition Facts panel discloses the amount of sugar in the Products, research has consistently shown that "[m]any consumers have difficulty interpreting nutrition labels[.]"[94]

128.   The "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use,"[95] and research shows "a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[96]

129.   A "National Assessment of Adult Literacy found that more than one-third of the US population had only basic or below-basic health literacy."[97] And other "studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information."[98] Thus, "[a] substantial proportion of consumers in this country, including those with a college education, have difficulty understanding NFP labels, which is likely a function of limited health literacy."[99]

130.   A 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[100]

---

[94] Persoskie A., Hennessy E., Nelson W.L., *US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy*, PREV. CHRONIC DIS. 14;170066 (2017).

[95] *Id.*

[96] *Id.* ("Some studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information[ ].").

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] "Study Shows Labeling Often Confuses Consumers," *Packaging Strategies* (Mar. 30, 2017) https://www.packagingstrategies.com/articles/94081-study-shows-labeling-often-confuses-consumers (citing Label Insight 2017 Shopper Trends Study, *available at* https://smallbusiness.report/Resources/Whitepapers/5018ac3d-4075-445b-bc15-bf114ebd97e1_labelinsight.pdf).

131.   Even the FDA recognizes there are many issues with the Nutrition Facts panel and that consumers need to be educated on "how to use th[e] [Nutrition Facts] information more effectively and easily." To help consumers, the FDA published a 12-page guide on "How to Understand and Use the Nutrition Facts Label."[101]

132.   Indeed, even Dole acknowledges that assessing the healthfulness of food is difficult for the average consumer in its "Malnutrition Labels" marketing campaign. That campaign was aimed at "consumer education" regarding "the necessary nutrients for a healthy and sustainable lifestyle,"[102] and included projecting images like the ones shown below onto buildings throughout New York City.[103]



---

[101] FDA, "How to Understand and Use the Nutrition Facts Label," (last updated Feb. 25, 2022) *available at* https://www.fda.gov/food/new-nutrition-facts-label/how-understand-and-use-nutrition-facts-label#top.

[102] "Dole Sunshine Company Takes Poor Snacking To Task with 'Malnutrition Labels' Printed with Nutritional Fruit Ink," Dolesunshine.com (Oct. 3, 2022), https://dolesunshine.com/us/en/news/dole-sunshine-company-takes-poor-snacking-habits-to-task-with-malnutrition-labels-printed-with-nutritional-fruit-ink/.

[103] *See* https://malnutritionfacts.com/projections.

133.    Because using the Nutrition Facts panel is complex (requiring one to simultaneously weigh the impact of numerous nutrients), many consumers simply don't use the Nutrition Facts panel.

134.    Dole is well aware of this fact:[104]



135.    And survey data indicates that even for those consumers who do try, the average consumer reads only the top five lines on a Nutrition Facts label (serving size, calories, total fat, saturated fat, trans fat).[105] Sugar, however, is listed tenth—following cholesterol, sodium, total carbohydrate, and dietary fiber—meaning few consumers consider it in their evaluations, or do so while already trying to weigh the impact of many other nutrients.

136.    And even for those who try to use the Nutrition Facts panel, it simply does not provide all the information one needs to assess the healthfulness of a food or beverage. For example, it provides no information on the level of processing of a food or how that processing affects the healthfulness of the food.

---

[104]  Dole Sunshine Company, "Dole – Malnutritrion Labels," https://www.youtube.com/watch?v=-ZSBEyblzw0 (Feb. 4, 2021) (shown at 0:10).

[105] Graham & Jeffery, *Location, location, location: Eye-tracking evidence that consumers preferentially view prominently positioned nutrition information*, J. AM. DIET ASSOC. (2011) (emphasis added).

137.    In short, the nutrition label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by itself to a better or more critical understanding of nutrition principles."[106]  As such, it does not dispel Dole's misleading messaging.

## B.    Dole Deceptively Omits Material Information

138.    While representing that the Products are beneficial to overall health, Dole regularly and intentionally omits material information regarding the countervailing detrimental effects of the FA Sugars on overall health.

139.    Dole is under a duty to disclose this information to consumers because it is revealing some information about the Products—enough to suggest they are beneficial—without revealing directly relevant information regarding the harmful effects of FA Sugar described herein.

140.    Dole is further under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming the Products.

141.    Dole is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the FA Sugars in the Products, as it is a large, sophisticated company that holds itself out as having expert knowledge regarding the health impact of consuming the Products.

142.    Moreover, Dole is under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiffs and the Class concerning the detrimental effects of regularly consuming the Products.

## IV.    THE PRODUCTS' LABELING VIOLATES STATE AND FEDERAL REGULATIONS

143.    "California, [and] New York . . . broadly prohibit the misbranding of food in language largely identical to that found in the FDCA." *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *4 (E.D.N.Y. July 21, 2010). California Health and Safety Code §§109875, *et. seq.* (the "Sherman Law") has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto."). Similarly,

---

[106] *Id.*

"New York's Agriculture and Marketing law similarly . . . incorporates the FDCA's labeling provisions found in 21 C.F.R. part 101." *Ackerman*, 2010 WL 2925955, at *4 (citing N.Y. Comp. Codes R. & Regs. tit. 1, § 259.1).

144.   The Products and their challenged labeling statements violate the FDCA and its California and New York state law equivalents.

145.   First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Dole accordingly also violated California's and New York's parallel provisions. *See* Cal. Health & Safety Code § 110670; N.Y. Agric. Mkts. Law § 201.

146.   Second, Dole violated FDA's Fortification Policy by fortifying its Fruit Bowl Parfaits, Fruit Bowls in Gel, Canned Tropical Fruit in Light Syrup and Passion Fruit Juice, and Canned Pineapple Juice with ascorbic acid (Vitamin C). *See* 21 C.F.R. § 104.20.

147.   Third, Dole "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s] [and] word[s]" challenged herein, in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products.

148.   Fourth, Dole failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Dole failed to disclose the increased risk of serious chronic disease and death that is likely to result from the usual consumption of the Products in the customary and prescribed manners.

## V.   PLAINTIFFS' PURCHASE, RELIANCE, AND INJURY

149.   Plaintiff Shamea Broussard purchased Fruit Bowls in Gel, Fruit Bowls in Juice, Canned Fruit in Juice, Canned Fruit in Heavy Syrup, Canned Fruit in Light Syrup, and Canned Fruit Juice throughout the Class Period, with her most recent purchase being approximately November 2022. She typically purchased the Products from Safeway, Lucky's, Food Max, and other stores in Pleasant Hill, California.

150.   When purchasing the Products, Ms. Broussard was seeking nutritious, healthy snacks, that is, those whose regular consumption would not likely increase the risk of disease. In purchasing the Products, Ms. Broussard was exposed to, read, and relied on Dole's health and wellness representations described

herein, including that the products are "good nutrition," "help[] support a healthy immune system, and that "Dole Fruit Bowls® seal in goodness and nutrition." These claims, however, were and are deceptive because the Products do not provide good nutrition or support a healthy immune system, and are not healthy or nutritious, but instead contain such high levels of FA Sugar that their regular consumption would likely contribute to an increased risk of disease.

151.    Plaintiff Michael Schirano purchased Fruit Bowls in Gel, Fruit Bowls in Juice, Canned Fruit in Juice, Canned Fruit in Heavy Syrup, Canned Fruit in Light Syrup, and Canned Fruit Juice throughout the Class Period, with his most recent purchase being in approximately early to mid-2023. He typically purchased the Products from Stop 'n Shop in West Islip, New York, Costco in either Commack or Melville, New York, and Target in either Commack or Bayshore, New York.

152.    When purchasing the Products, Mr. Schirano was seeking nutritious, healthy snacks, that is, those whose regular consumption would not likely increase the risk of disease. In purchasing the Products, Mr. Schirano was exposed to, read, and relied on Dole's health and wellness representations described herein, including that the Products are "good nutrition," "help[] support a healthy immune system, and that "Dole Fruit Bowls® seal in goodness and nutrition." These claims, however, were and are deceptive because the Products do not provide good nutrition or support a healthy immune system, and are not healthy or nutritious, but instead contain such high levels of FA Sugar that their regular consumption would likely contribute to an increased risk of disease.

153.    Plaintiffs are not nutritionists, food experts, or food scientists, but rather lay consumers who did not have the specialized knowledge that Dole had about the scientific literature regarding the likely health effects of consuming the Products given their FA Sugar content. At the time of their purchases, Plaintiffs were unaware of the extent to which consuming high amounts of FA Sugar adversely affects health or what amount of FA Sugar might have such an effect. Plaintiffs were also unaware that consuming more than the daily recommended amount of vitamin C would not result in additional benefits to their immune system or that consumption of the amounts of FA Sugar in the Products adversely affects immune system function.

154.    Plaintiffs acted reasonably in relying on the challenged labeling claims, which Dole intentionally placed on the Products' labeling with the intent to induce average consumers into purchasing the Products.

155.   Plaintiffs would not have purchased the Products if they knew that the challenged labeling claims were false and misleading in that the Products are not nutritious, do not provide the health benefits promised, and are detrimental rather than beneficial to health.

156.   The Products cost more than similar products without misleading labeling and would have cost less absent Dole's false and misleading statements and omissions.

157.   Through the misleading labeling claims and omissions, Dole was able to gain a greater share of the packaged fruit and juice markets than it would have otherwise and was able to increase the size of those markets.

158.   Plaintiffs paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

159.   Plaintiffs would not have purchased the Products if they had known that the Products were misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

160.   For these reasons, the Products were worth less than what Plaintiffs and the Class paid for them.

161.   Instead of receiving products that had actual healthful qualities, the Products that Plaintiffs and the Class received were likely to lead to increased risk of disease when consumed regularly.

162.   Plaintiffs and the Class lost money as a result of Dole's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Products.

163.   Plaintiffs still wish to purchase healthy packaged fruits and juices with nutritional benefits and continue to see the Products at stores when they shop. They would purchase the Products in the future if the Products were as represented, but unless Dole is enjoined in the manner Plaintiffs request, they may not be able to rely on Dole's health and wellness claims in the future.

164.   Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Dole, continues to be violated every time Plaintiffs are exposed to the misleading labeling claims and omissions.

165.   Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

166.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons the in United States, and separately Subclasses of all persons in California and New York, who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Dole Products (the "Class," and the "California Subclass" and "New York Subclass," which are subsumed and included therein).

167.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

168.    Questions of law and fact common to Plaintiffs and the Class (or Subclasses) include:

a.     whether Dole communicated a message regarding the healthfulness of the Products through its packaging and advertising;

b.     whether that message was material, or likely to be material, to a reasonable consumer;

c.     whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

d.     whether Dole's conduct violates public policy;

e.     whether Dole's conduct violates state or federal food statutes or regulations;

f.     the proper amount of damages, including statutory and punitive damages;

g.     the proper amount of restitution;

h.     the proper scope of injunctive relief; and

i.     the proper amount of attorneys' fees.

169.    These common questions of law and fact predominate over questions that affect only individual Class Members.

170.    Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Dole's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the

47

Products and suffered economic injury because the Products are misrepresented. Absent Dole's business practice of deceptively and unlawfully labeling the Products, Plaintiffs and Class Members would not have purchased them or would have paid less for them.

171.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

172.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

173.    Dole has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

174.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

**(On Behalf of the Nationwide Class and California Subclass)**

175.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

176.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

177.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

**Fraudulent**

178.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

179.   As set forth herein, the challenged labeling claims and omissions relating to the Dole Products are likely to deceive reasonable consumers and the public.

**Unlawful**

180.   The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

**Unfair**

181.   Dole's conduct with respect to the labeling, advertising, and sale of the Products was unfair because Dole's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

182.   Dole's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, including the Fortification Policy, and portions of the California Sherman Food, Drug, and Cosmetic Law and the New York Agriculture and Marketing Law.

183.   Dole's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Dole through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products, believing they were healthy, when in fact they are the types of food and beverage likely to detriment health.

184.   Dole profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

185.    Plaintiffs and Class Members are likely to continue to be damaged by Dole's deceptive trade practices, because Dole continues to disseminate misleading information. Thus, injunctive relief enjoining Dole's deceptive practices is proper.

186.    Dole's conduct caused and continues to cause substantial injury to Plaintiffs and other Class Members. Plaintiffs have suffered injury in fact as a result of Dole's unlawful conduct.

187.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Dole from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

188.    Plaintiffs and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

189.    Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Dole's challenged behavior.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.***

**(On Behalf of the Nationwide Class and California Subclass)**

190.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

191.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

192.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

193.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Dole relating to the Products were likely to mislead consumers acting reasonably, as to the healthfulness of the Products.

194.    Plaintiffs suffered injury in fact as a result of Dole's actions as set forth herein because they purchased the Products in reliance on Dole's false and misleading marketing claims stating or suggesting that the Products are healthful and nutritious and support immune system function.

195.    Dole's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Dole has advertised the Products in a manner that is untrue and misleading, which Dole knew or reasonably should have known, and omitted material information from the Products' labeling.

196.    Dole profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

197.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Dole was unjustly enriched.

198.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Dole from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

199.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for the breach of warranty claims), and restitution is not limited to returning to Plaintiffs and the Class monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

### (On Behalf of the Nationwide Class and California Subclass)

200.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

201.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

202.    Dole's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.      § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

203.    Dole profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

204.    Dole's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

205.    Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiff Broussard sent written notice of her claims and Dole's particular violations of the Act to Dole by certified mail, return receipt requested, but Dole has failed to implement remedial measures.

206.    As a result, Plaintiffs and the Class have suffered harm, and therefore seek (a) actual damages resulting from purchases of the Products sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising, (d) restitution, and (e) attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

207.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

**FOURTH CAUSE OF ACTION**

**Breaches of Express Warranties, Cal. Com. Code § 2313(1)**

**(On Behalf of the Nationwide Class and California Subclass)**

208.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

209.    Through the Products' labeling, Dole made affirmations of fact or promises, or description of goods, that, *inter alia*, the products are nutritious, are beneficial to health, and provide nutritional and health benefits. These affirmations and descriptions include:

• "It's our promise to provide everyone, everywhere with good nutrition!"

• "Dole Fruit Bowls® seal in goodness and nutrition."

• "Vitamin C is an antioxidant that helps support a healthy immune system."

• "Vitamin C to support a healthy immune system."

210.    These representations were "part of the basis of the bargain," in that Plaintiffs and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

211.    Dole breached its express warranties by selling Products that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

212.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and Class Members paid for the Products.

213.    As a result, Plaintiffs seek, on behalf of themselves and other Class Members, their actual damages arising as a result of Dole's breaches of express warranty, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314

### (On Behalf of the Nationwide Class and California Subclass)

214.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

215.    Dole, through its acts set forth herein, in the sale, marketing, and promotion of the Products bearing statements outlined in paragraph 209, made representations, that, *inter alia*, the Products are healthy and nutritious.

216.    Dole is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there were, in the sale to Plaintiffs and the Class, implied warranties that those goods were merchantable.

217. However, Dole breached that implied warranty because, for the reasons discussed herein, the Products were and are not healthy and nutritious.

218. As an actual and proximate result of Dole's conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Dole to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

219. As a result, Plaintiffs seek actual damages, including, without limitation, expectation damages.

## SIXTH CAUSE OF ACTION

### Unfair and Deceptive Business Practices, N.Y. Gen. Bus. L. § 349

### (On behalf of the New York Subclass)

220. Plaintiff Schirano realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

221. Dole's conduct constitutes deceptive acts or practices or false advertising in the conduct of business, trade, or commerce or in the furnishing of services in New York which affects the public interest under N.Y. Gen. Bus. L. § 349.

222. As alleged herein, Dole engaged in, and continues to engage in, deceptive acts and practices by advertising, marketing, distributing, and selling the Products with false or misleading claims and representations, and deceptive omissions.

223. As alleged herein, by misbranding the Products, Dole engaged in, and continues to engage in, unlawful and deceptive acts and practices.

224. Dole's conduct was materially misleading to Plaintiff Schirano and the New York Subclass. During the Class Period, Dole carried out a plan, scheme and course of conduct which was consumer oriented.

225. As a direct and proximate result of Dole's violation of N.Y. Gen. Bus. L. § 349, Plaintiff Schirano and the New York Class were injured and suffered damages.

226. The injuries to Plaintiff Schirano and the New York Subclass were foreseeable to Dole and, thus Dole's actions were unconscionable and unreasonable.

227.    Dole is liable for damages sustained by Plaintiff Schirano and the New York Subclass to the maximum extent allowable under N.Y. Gen. Bus. L. § 349, actual damages or $50 per unit, whichever is greater.

228.    Pursuant to N.Y. Gen. Bus. L. § 349(h), Plaintiff Schirano and the New York Subclass seek an Order enjoining Dole from continuing to engage in unlawful acts or practices, false advertising, and any other acts prohibited by law, including those set forth in this Complaint.

## SEVENTH CAUSE OF ACTION

### False Advertising, N.Y. Gen. Bus. L. § 350

### (On behalf of the New York Subclass)

229.    Plaintiff Schirano realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

230.    Dole has engaged and is engaging in consumer-oriented conduct which is deceptive or misleading in a material way (both by affirmative misrepresentations and by material omissions), constituting false advertising in the conduct of any business, trade, or commerce, in violation of N.Y. Gen. Bus. L. § 350.

231.    As a result of Dole's false advertising, Plaintiff Schirano and the New York Subclass Members have suffered and continue to suffer substantial injury, including damages, which would not have occurred but for the false and deceptive advertising, and which will continue to occur unless Dole is permanently enjoined by this Court.

232.    Plaintiff Schirano and the New York Subclass seek to enjoin the unlawful acts and practices described herein, and to recover their actual damages or $500 per unit, whichever is greater, and reasonable attorney fees.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of the Nationwide Class and California and New York Subclasses)

233.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

234.    Plaintiffs and Class Members conferred upon Dole an economic benefit, in the form of profits resulting from the purchase and sale of the Products.

235.    Dole's financial benefits resulting from their unlawful and inequitable conduct are economically traceable to Plaintiffs' and Class Members' purchases of the Products and the economic benefits conferred on Dole are a direct and proximate result of its unlawful and inequitable conduct.

236.    It would be inequitable, unconscionable, and unjust for Dole to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

237.    As a result, Plaintiffs and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Dole as a result of such business practices.

**NINTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(On Behalf of the Nationwide Class and California and New York Subclasses)**

238.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

239.    Dole marketed the Products in a manner conveying to reasonable consumers that the Products provide good nutrition, promote general health and wellness, and provide specific health benefits, like immune health support.

240.    Dole's misrepresentations regarding the Products are material to a reasonable consumer because they relate to human health, generally, and immune health, specifically. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase decisions.

241.    In selling the Products, Dole acted in the ordinary course of its business and had a pecuniary interest in Plaintiffs and Class Members purchasing the Products.

242.    Dole owed a duty of care to Plaintiffs, not to provide them with false information when they were making their purchase decisions regarding the Products.

243.    Dole knew or had been negligent in not knowing that the Products did not promote health, but instead, harm rather than support the overall health and immune system function of the average consumer,

due to their high FA Sugar content. Dole had no reasonable grounds for believing its misrepresentations were not false and misleading.

244.    Dole intends that Plaintiffs and other consumers rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Products' packaging by Dole.

245.    Plaintiffs and Class Members have reasonably and justifiably relied on Dole's misrepresentations when purchasing the Products, and had the correct facts been known, would not have purchased them at the prices at which they were offered.

246.    Therefore, as a direct and proximate result of Dole's negligent misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### Intentional Misrepresentation

**(On Behalf of the Nationwide Class and California and New York Subclasses)**

247.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

248.    Dole marketed the Products in a manner conveying to reasonable consumers that the Products promote general health and wellness and immune system function. However, consuming sugar sweetened foods and beverages like the Products harms rather than supports the overall health of the average consumer and harms rather than supports the immune system. Therefore, Dole has made misrepresentations about the Products.

249.    Dole's misrepresentations regarding the Products are material to a reasonable consumer because they relate to human health, generally, and immune health, specifically. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

250.    At all relevant times, Dole knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

251.    Dole intends that Plaintiffs and other consumers rely on these misrepresentations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Products' packaging by Dole.

252.    Plaintiffs and members of the Class have reasonably and justifiably relied on Dole's intentional misrepresentations when purchasing the Products; had the correct facts been known, they would not have purchased the Products at the prices at which the Products were offered.

253.    Therefore, as a direct and proximate result of Dole's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

254.    Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Dole as to each and every cause of action, and the following remedies:

a.      An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b.      An Order requiring Dole to bear the cost of Class Notice;

c.      An Order requiring Dole to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

d.      An Order requiring Dole to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

e.      An Order requiring Dole to pay compensatory, statutory, and punitive damages as permitted by law;

f.      An award of attorneys' fees and costs; and

g.      Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

255.    Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 3, 2023                    /s/ Melanie Persinger

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***

*Broussard et al. v. Dole Packaged Foods, LLC*, No. 3:23-cv-3320
CLASS ACTION COMPLAINT